**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHETTIE JEAN CLEMOW,                                    Case No. 1:20-cv-592

        Plaintiff,                                            Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.[1]  As explained below, the Court will AFFIRM the ALJ's finding of non-disability, because it is supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

The instant appeal is Plaintiff's second in this Court.  Plaintiff previously filed an application in June 2013, alleging a disability onset date of June 21, 2011.  (Tr. 125).  On November 5, 2015, Administrative Law Judge ("ALJ") Andrew Gollin denied her prior claim in a written decision issued after an evidentiary hearing.  (Tr. 122-146).  This Court affirmed that decision on February 28, 2018.[2]

---

[1]The parties have consented to final disposition before the undersigned magistrate judge in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.
[2]*See Clemow v. Com'r of Soc. Sec.*, Case No. 1:16-cv-994, 2018 WL 1083494, at *5 (S.D. Ohio, Feb. 28, 2018) (Bowman, M.J.).

1

Around the same time that she filed a judicial appeal of ALJ Gollin's decision, in December 2016, Plaintiff filed a new application for Disability Insurance Benefits ("DIB"), alleging a disability onset date of November 6, 2015[3] due to a combination of impairments, but based primarily upon fibromyalgia, depression and anxiety. (*See* Tr. 91). Plaintiff is insured only through September 30, 2018, meaning that she is required to prove that she became disabled prior to that date.

After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing.  On February 8, 2019 and again on June 14, 2019, Plaintiff appeared with counsel in Cincinnati, Ohio and gave testimony before ALJ Kristen King. A vocational expert also testified.  (Tr. 36-69; Tr. 69-89).  Plaintiff was 46 years old, defined as a younger individual, on her date last insured ("DLI").   She has the equivalent of a high school degree and lives with her adult daughter in an apartment.  She has past relevant work as a bank teller, a retail store clerk, and a health club manager, but has not worked since 2013. (Tr. 45).

On September 9, 2019, ALJ King issued an adverse written decision, concluding that Plaintiff was not disabled prior to her DLI. (Tr. 12-29).  The ALJ determined that Plaintiff has "the following impairments, severe in combination…:  osteoarthritis (OA) of multiple joints, status post total knee replacement (TKR), status post rotator cuff repair on the left with history of tennis elbow, fibromyalgia, obesity, obstructive sleep apnea (OSA), thyroid disorder, depression, anxiety, and posttraumatic stress disorder (PTSD)."  (Tr. 18).  In this judicial appeal, Plaintiff does not challenge the ALJ's findings concerning which impairments were severe, nor does she dispute the determination that none of her

---

[3]The prior adverse decision bars Plaintiff from asserting any earlier disability onset date.

2

impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability.

There is no dispute that Plaintiff's multiple impairments preclude her from performing her past work. (Tr. 27). However, the ALJ determined that, through her DLI, Plaintiff retained an RFC that permits her to perform a range of other light and/or sedentary work, subject to the following additional limitations:

> [S]he should operate foot controls no more than 20% of the workday bilaterally. She should never climb ladders, ropes, or scaffolds. She could occasionally climb ramps or stairs, balance, stoop, kneel, and crouch. She should never crawl. She could perform overhead reaching no more than 10%. She must avoid all exposure to extreme cold and extreme heat. She must avoid all use of dangerous machinery and all exposure to unprotected heights. She required a sit/stand option at will provided that she is not off task more than 10% of the workday. She was limited to simple, routine, tasks. She is able to perform goal-oriented work, but no constant production rate pace work, such as automated assembly line, and no strict hourly quotas. She was limited to jobs in which changes occur no more than approximately 10% of the workday. She could interact with the public no more than 5% of the workday, but no transactional interactions such as sales or negotiations. She could have only occasional interaction with coworkers with no tandem tasks or as part of a team.

(Tr. 19-20).[4]

Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a significant number of jobs in the national economy, including the representative occupations of merchandise marker, inspector-hand packager, small parts assembler, and router clerk. (Tr. 28). The ALJ further determined that even if Plaintiff were limited to the sedentary work level, she

---

[4]In the prior adverse decision, ALJ Gollin determined that Plaintiff remained capable only of a limited range of sedentary work. However, ALJ King determined that RFC determination was not binding, based upon Plaintiff's production of "new and material evidence documenting a significant change in [her] condition." (Tr. 16).

3

still could perform jobs such as printed circuit board assembly screener, table worker, document preparer, addresser, and stuffer. (Tr. 28-29). Therefore, the ALJ determined that Plaintiff was not under a disability. (Tr. 29). The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff first argues that the ALJ erred in evaluating the medical opinion evidence, which led to error in the formulation of her RFC. In a related error, she argues that the ALJ erred in evaluating her subjective symptoms.

## II. Analysis

### A. Standards of Review Applicable to Plaintiff's Claims

#### 1. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial

4

evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### 2. Administrative Standards

#### a. The Treating Physician Rule

Although new regulations took effect on March 27, 2017, this case is subject to an earlier regulation contained in 20 C.F.R. §404.1527.[5] With respect to treating physicians, the prior regulation provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.927(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

The treating physician rule generally requires the ALJ to give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Nevertheless, "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.,* 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). Thus, no reversible error occurs when an ALJ determines that a treating physician opinion is not entitled to controlling weight because it is not well-supported, is internally inconsistent, and/or is inconsistent with the record as a whole. However, an ALJ must provide "good reasons" for discounting the weight given to the opinion of a treating physician in order to allow for meaningful judicial review. 20 C.F.R. § 404.1527(c)(2).

---

[5]For claims filed after March 27, 2017, entirely different medical opinion rules in 20 C.F.R. § 404.1520c apply. *See* 20 C.F.R. § 404.1527; § 404.1520c; 82 Fed. Reg. 15132 (March 27, 2017) (amending and correcting final rules published at 82 Fed. Reg. 5844).

### b. Evaluation of Fibromyalgia Claims

In *Rogers v. Com'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007), the Sixth Circuit recognized that "fibromyalgia is not susceptible of objective verification through traditional means" and that a rheumatologist is uniquely qualified to evaluate the clinical signs of fibromyalgia, including "tenderness in the appropriate focal points." *Id*. at 244-45. In *Rogers*, the court reversed because the ALJ failed to discuss the tender points standard and did not recognize consistent and extensive documentation of "continuous and frequent" treatment by two treating physicians of "ongoing complaints of intense pain and stiffness throughout Rogers' body as well as fatigue." *Id*., 486 F.3d 234, 244.

Fourteen years after *Rogers*, the case law reflects greater understanding of conditions like fibromyalgia by both the Social Security Administration and the courts. In 2012, the Social Security Administration published Social Security Ruling, SSR 12-2p, to provide specific guidance in the evaluation of fibromyalgia. 2012 WL 3104869 (July 25, 2012); see also, *generally*, SSR 14-1p, 79 Fed. Reg. 18752, 2014 WL 1371245 (April 3, 2014).[6] As SSR 12-2p explains: fibromyalgia "is a common syndrome." 2012 WL 3104869 at *2. Importantly, most people with fibromyalgia suffer less than disabling limitations. *See Vance v. Com'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. Jan. 15, 2008) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996)) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority."). As with many other common conditions, an ALJ may find fibromyalgia to be a severe impairment, but still

---

[6]SSR 14-1p primarily addresses chronic fatigue syndrome but references fibromyalgia as a condition that sometimes co-occurs with CFS. It does not abrogate SSR 12-2p or modify the process for determining whether a person is disabled under the Social Security Act.

appropriately discredit the plaintiff's subjective claims that it is disabling. *See Luukkonen v. Com'r of Soc. Sec.*, 653 Fed. Appx. 393, 400 (6th Cir. 2016).

Objective evidence is not wholly irrelevant merely because a claimant suffers from a condition like fibromyalgia. Thus, SSR 12-2p continues to require "sufficient <u>objective evidence</u> to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." 2012 WL 3104869 at *2 (emphasis added). It is the type of "objective evidence" or "signs or laboratory findings" that may vary, not the existence of such. "[L]ongitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of" fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *3. Evidence from the treating physician must document a physical exam as well as medical history, and treatment notes must reflect "whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." 2012 WL 3104869 at *2. In addition, both SSR 12-2p and SSR 14-1p make clear that "[i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.*, 2012 WL 3104869 at *5; 2014 WL 1371245 at *7.

Having reviewed the relevant judicial and administrative standards applicable to Plaintiff's claim, the Court next reviews the relevant medical records.

8

**B.  Relevant Medical Evidence**

The Court begins with a summary of records relating to Plaintiff's FM and knee pain prior to summarizing her mental health records.

**1.  Physical Health Records**

Plaintiff began treating with her rheumatologist, Dr. Adhikari, on March 11, 2015, 8 months prior to her alleged disability.  At the initial visit, Dr. Adhikari diagnosed fibromyalgia ("FM") and osteoarthritis based in part upon 18 out of 18 positive fibromyalgia tender points, crepitus in both knees, and paraspinal muscle spasms, as well as imaging studies that showed degenerative joint disease. (Tr. 425-26).  She prescribed medications as well as aquatic therapy.  (Tr. 426-27).  At a follow-up in September 2015, Dr. Adhikari increased one medication after Plaintiff reported fibromyalgia flares 2-3 times per month and severe fatigue.  On that date, Plaintiff was positive for 15/18 fibromyalgia tender points, with continued paraspinal muscle spasms and bony crepitus of her knees, but otherwise normal objective findings. (Tr. 432-33).

A week prior to Plaintiff's alleged onset of disability, on October 28, 2015, Plaintiff returned to Dr. Adhikari complaining of continued chronic "aches all over and fatigue" and depression. (Tr. 437).  At that time, Plaintiff's positive fibromyalgia tender points were again 18/18, with continued paraspinal muscle spasms and bony crepitus in her knees. (Tr. 438).  Despite ongoing pain complaints, other objective findings were normal, including Plaintiff's gait and extremity strength.  In coordination with Plaintiff's psychiatrist who was weaning her off Cymbalta, Dr. Adhikari prescribed Savella and referred her to physical therapy ("PT").  (Tr. 437; *see also* Tr. 432).

On November 9, 2015, Plaintiff presented for her first PT visit, at which she reported her pain level at a "2" in her back and at a "4" in her knee. (Tr. 863).  The physical

therapist agreed with Dr. Adhikari that Plaintiff should find a local pool where she could engage in aquatic therapy and "to cont[inue] with activity and not avoid activities as this will lead to deconditioning." (*Id*.) The evaluation showed limited range of motion in both knees and back with "moderate tightness in lumbar paraspinals," impaired standing and impaired sensation "occasionally" in the left arm and hands with numbness and tingling at least once per week. (Tr. 864-871). The prognosis was "good," with the expectation that Plaintiff would improve her standing tolerance to 1 hour within 4 weeks. (Tr. 866).

At her next follow-up visit with Dr. Adhikari on December 8, 2015, Plaintiff reported feeling "*much better*," denying <u>any</u> muscle or joint pain after treatment with Savella and aquatic PT. (Tr. 559, emphasis added). On exam, Plaintiff exhibited only 4/18 tender points, with continued paraspinal muscle spasms as well as crepitus of the knees, but normal gait and strength. (*Id*.)

On February 18, 2016, Plaintiff was seen by her primary care physician, Dr. Schaible, for a new complaint of left shoulder pain. (Tr. 1263). She reported night-time numbness in the left hand and fingers and an inability to perform overhead activities, but told Dr. Schaible she had recently begun PT. Physical exam confirmed a limited range of motion in the shoulder but noted "[g]rip ok, no pain." (Tr. 1263). Dr. Schaible prescribed Norco and advised Plaintiff to seek orthopedic care if she continued to have issues after she completed PT. (*Id*.) Plaintiff restarted PT on February 12, 2016. However, on her second PT visit she stated she planned to "change her appt times to accommodate help for a neighbor." She also expressed concern "about extended walking req'd to attend a circus performance." (Tr. 892). Plaintiff attended PT only through February 23rd before quitting; she was discharged for lack of attendance. (Tr. 904-06, 915).

On March 10, 2016, Plaintiff returned to Dr. Adhikari with a report of worsening FM symptoms and increased knee pain, with achiness, soreness and dull pain all over as well as stiffness and difficulty sleeping. (Tr. 569). She acknowledged that the prior aquatic therapy had been helpful and asked for a new PT prescription. (*Id.*) Dr. Adhikari noted a limping gait, crepitus of the knees, and 18/18 positive tender points with paraspinal muscle spasms throughout the spine. (Tr. 570). However, Dr. Adhikari also noted an absence of inflamed or tender joints and normal strength in extremities. (*Id.*) Dr. Adhikari increased Plaintiff's Savella, changed an anti-inflammatory medication, and administered cortisone injections to both knees. (Tr. 569)

At the next follow-up on June 10, 2016, Dr. Adhikari described Plaintiff's FM as "stable" with the number of tender points having decreased to 6/18 only in her neck and back, with continued paraspinal muscle spasm. (Tr. 442). Subjectively, Plaintiff continued to complain of knee pain and left knee swelling. (Tr. 442). An exam found moderate effusion and discomfort in the left knee, presumed due to osteoarthritis. (Tr. 443). Other than her knees, Plaintiff had unremarkable joints and normal strength. Dr. Adhikari recommended that Plaintiff follow up with her orthopedist for knee pain. (Tr. 442-443, 581). In contrast to the noted improvement of FM symptoms in June, on July 27, 2016, Dr. Adhikari authored a narrative letter that endorsed multiple work-related limitations (discussed below) that would be work-preclusive. (Tr. 462).

At a follow-up on October 10, 2016, Plaintiff reported achiness and stiffness primarily in her shoulder blades and back, a feeling of heaviness and increased achiness in her joints, especially her knees. (Tr. 449). Upon exam, Dr. Adhikari noted FM tender points in the neck and upper back and crepitus in both knees, but once again described Plaintiff's FM as "stable on Savella," with "stable" depression. (Tr. 448-50). Plaintiff also

11

reported that her FM was "stable" but that she noticed "achiness, stiffness mainly in her shoulder blade and back," for which she took prescribed muscle relaxants on an "as-needed basis." (Tr. 449).  She reported Savella was helping with her depression, but complained her knees were especially achy based in part upon weight gain.  (*Id*.)  Dr. Adhikari prescribed weight loss and exercise.  (Tr. 448).

On October 27, 2016, Plaintiff returned to Dr. Schaible for routine follow-up of chronic conditions and new complaints of wheezing and skin tags.  Dr. Schaible noted she was "doing well" with fibromyalgia treatment from Dr. Adhikari, and was also "doing well" with treatment for her anxiety and depression. (Tr. 1278).  Dr. Schaible described Plaintiff's FM as "stable" and "controlled" with normal range of motion in extremities. (Tr. 1278-79)

At a follow-up with Dr. Adhikari on March 15, 2017, Plaintiff reported a worsening of her FM, with correspondingly worse knee pain, though her depression was stable. (Tr. 494).  She reported increased FM flares, soreness and stiffness, as well as difficulty moving, soreness and stiffness in her knees and that during flares, none of her medications were effective and she was "barely able to get out of the bed" and "barely able to move." (Tr. 494-95).  She stated she was "unable to do" the prescribed aquatic therapy but denied swollen joints.  (Tr. 495, 606, 641).  On exam, Dr. Adhikari found generalized hyperesthesia[7] and noted that all fibromyalgia tender points were positive.

---

[7]"The International Association for the Study of Pain defines hyperesthesia as 'increased sensitivity to stimulation, excluding the special senses,' which 'may refer to various modes of cutaneous sensibility including touch and thermal sensation without pain, as well as to pain.' While hyperesthesia can be used to describe any increased sensitivity to a stimulus, it is commonly used to describe a painful sensation from a stimulus."  https://www.ncbi.nlm.nih.gov/books/NBK563125/ (accessed on November 19, 2021)

(Tr. 496, 607). Dr. Adhikari changed Plaintiff's muscle relaxant and added Tramadol for her FM flares. (Tr. 494).

Plaintiff next scheduled an appointment with Dr. Adhikari on August 4, 2017 "for evaluation and filling disability paperwork." (Tr. 645). At that appointment, Plaintiff reported widespread musculoskeletal pain, depression and anxiety, with varied symptoms from days where she feels "fine" to days where she is "miserable," with "mostly bad days." (*Id*.) She reported "difficulty in taking care of herself during flares" as a reason she could not work, as well as "persistent" mental fog and fatigue. (Tr. 645). On exam, Dr. Adhikari noted positive tenderness in all FM trigger points, diffuse hyperesthesia in non-fibromyalgia tender points, and bilateral knee crepitus with joint line tenderness. (Tr. 647). Although Dr. Adhikari made no treatment changes, she completed a Questionnaire in which she endorsed significant and work-preclusive limitations (discussed below) based upon Plaintiff's subjective report. (Tr. 548)

A month later on September 6, 2017, Dr. Adhikari again noted Plaintiff's fibromyalgia and depression were "stable," with worsening knee pain from osteoarthritis. (Tr. 649). Her fibromyalgia flares occurred once or twice per month but were treated with Tramadol p.r.n. (Tr. 649). Plaintiff reported trying to lose weight by watching her diet but was unable to exercise due to chronic pain. (*Id*.) On exam, she exhibited no tender or inflamed joints in her extremities and had only 10/18 fibromyalgia tender points in her neck, back, knees and hips, with normal gait and strength. (Tr. 651).

Plaintiff pursued orthopedic treatment for her left knee in October 2017 with surgeon Mark Siegel, M.D., who recorded significant abnormal findings. (Tr. 1320-26). Orthopedic surgeon Suresh Nayak, M.D. documented similar findings on December 5, 2017. (Tr. 925-928). On January 17, 2018, Plaintiff underwent a total left knee

13

replacement ("TKR").  (Tr. 922-924).  On April 6, 2018, ten weeks after her TKR, Plaintiff reported "satisfactory" pain control with only "a little bit of discomfort from time to time," and no more than "expected" post-surgical swelling. (Tr. 920). The examiner noted that "the patient is doing quite well" and suggested returning for an "annual checkup" unless she had any additional issues.  (Tr. 920).

The last fibromyalgia record with Dr. Adhikari prior to Plaintiff's DLI is dated March 12, 2018.  At that time, Dr. Adhikari again assessed Plaintiff's fibromyalgia and depression as "stable," while noting that she was "doing well" post-operatively from TKR.  (Tr. 653). Dr. Adhikari further states that Plaintiff is doing "*very well in terms of osteoarthritis and fibromyalgia*." (Tr. 653 (emphasis added)).  Plaintiff reported that she "feels better in terms of musculoskeletal pain" overall, denied any swollen or inflamed joints, was not taking NSAIDs, and had no GI side effects, sedation or other ill effects.  (Tr. 653).  On exam, she exhibited only 4 out of 18 positive fibromyalgia tender points in the neck and lower back, with full range of motion and no tender or inflamed joints.  She had normal gait and muscle strength, with persistent "asymptomatic" crepitus in the right knee.  (Tr. 656). No changes were made to Plaintiff's treatment plan.  (Tr. 653).

Soon after the expiration of Plaintiff's insured status, on October 23, 2018, Plaintiff reported renewed generalized pain in her shoulders, neck and lower back with episodic fibromyalgia flares.  (Tr. 735-36).  She used muscle relaxants during flares but had significant tiredness.  (Tr. 736).  Dr. Adhikari found 18/18 tender points.  (Tr. 738).  Dr. Adhikari "[s]tressed the importance of physical reconditioning and daily stretching." Plaintiff reported that she had gotten a hot tub and tried to go in it every day.  (Tr. 735).

### 2.  Mental Health Records

Considering Plaintiff's mental health records, the ALJ pointed out that records shortly before her disability onset date suggested some improvement.  (Tr. 24, citing B2 at 6 and B1F at 13 (subjective report that "[d]epression is better")).  With regard to records that post-date the disability onset date, the ALJ also cited to a July 2016 record that described Plaintiff as "not…as anxious (fidgety and knee shaking) as she usually is."  (*Id*., citing B2F/2).  An October 2016 record listed her depression as stable with no mention of anxiety.  (*Id*.)  In November 2016, she was described as "more relaxed," as well as "[m]ore comfortable with self and surrounding with her lack of anxious body language."  (Tr. 455).  At an appointment with CNP Jordan in February 2017, Plaintiff related her history of mental health symptoms including mood swings but stated that her symptoms were "not as severe as prior to taking meds."  (*Id*. citing B4F/1). She reported her mood as "okay." (*Id*.)   In April 2017, treatment records described Plaintiff as "calm, poised, and easy to talk to."  (Id., citing B9F/9).

The ALJ cited to numerous additional records that suggested that Plaintiff's symptoms were improved and well managed with medication.

> By July 2017, the claimant denied anxiety or depression (B24F/10) and displayed intact orientation, judgment, insight, memory, and mood/affect (*Id*.). In January 2018, she admitted, "everything is fine" (B19F/14). Similarly, in July 2018, the claimant listed her mood as "good," although she reported she continued to struggle with irritability and agitation (B17F/9). Mental status examination found the claimant to be polite and oriented with normal speech and appropriate presentation (*Id*.). Her thoughts were logical and her affect was full (*Id*.). Her insight was found to be fair, while her judgment was stable (*Id*.). She denied suicidal ideation, homicidal ideation, and psychotic features (*Id*.). It was observed the claimant's mood appeared stable and she did not appear depressed (*Id*.at 10).

> Records dated July 2018 include a report from the claimant that her medications "have been helping," but she reported taking Buspar only once per day noting, "I keep forgetting to take it again" (*Id.* at 11). Although the claimant displayed anxious mood and dramatic affect, the remainder of the

mental status examination was within normal limits (*Id.*). Additional records dated October 2018 note the claimant presented as alert with good fund of knowledge, normal speech rate, clear articulation, and good coherence (B18F/6). Of note, the claimant admitted she had not been attending therapy (B21F/14).[8] Other records at that time note the claimant reported her paranoia was improved (B19F/2).[9] She described her mood as "fine" and reported cleaning for her daughter and taking care of pets (*Id.*). Mental status examination found the claimant polite and cooperative, alert and oriented (*Id.* at 3). No deficits were observed in terms of speech, thoughts, mood, affect, insight, and judgment (*Id.*; *see also* B21F/11 for unchanged reports/findings).

(Tr. 24-25).

### C. Plaintiff's First Claim: The Evaluation of Medical Opinion Evidence

The record contains four medical opinions that focus on Plaintiff's physical impairments, and three additional opinions that focus on her mental impairments. Plaintiff argues that the ALJ erred in her assessment of all seven medical opinions, which led to an incorrect formulation of her RFC.[10] The Court finds no reversible error.

### Dr. Adhikari and Dr. Schaible

Both Plaintiff's treating rheumatologist and her primary care physician, Drs. Adhikari and Schaible, offered very similar physical RFC opinions, which Plaintiff argues should have been given controlling weight rather than the "limited weight" afforded by the ALJ. Plaintiff alternatively suggests that even if her treating physicians' opinions did not qualify for "controlling weight." the ALJ still should have given their opinions greater

---

[8]The cited record appears to be located at B21F/12; *see also* B21F/15.
[9]The cited record appears to be located at B19F/6. (*See* Tr. 713).
[10]The ALJ declined to adopt any of the RFC opinions in their entirety, instead formulating Plaintiff's RFC based on the assessment of the record as a whole, including Plaintiff's testimony and medical records. The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined an RFC based on objective medical evidence and non-medical evidence as the ALJ did here. *See Ford v. Com'r of Soc. Sec.,* 114 Fed. Appx. 194 (6th Cir. 2004); *Poe v. Com'r of Soc. Sec.,* 2009 WL 2514058, at *7 (6th Cir.Aug.18, 2009).

weight than the "some weight" given to the opinions of agency consultants. (Doc. 10 at 27, PageID 1411).

Dr. Adhikari offered three separate physical RFC opinions, including two within the relevant disability period (July 2016 and August 2017) and a third approximately three months after Plaintiff's September 30, 2018 DLI. All three opinions contain fairly extreme and work-preclusive limitations. For example, all three opinions state that Plaintiff can sit, stand and walk for less than one hour in an eight-hour workday, and would need to take unscheduled breaks every 20-30 minutes for at least 20 and up to 60 minutes at a time.[11] (*See* Tr. 462, 550-51, 776-784). She also indicates that Plaintiff would be absent from work more than three times per month. (Tr. 26; *see also* Tr. 462, 550-51, 784).

Plaintiff's primary care physician, Dr. Schaible, completed a similar form dated January 17, 2019 stating that she generally examines Plaintiff twice per year for chronic conditions including fibromyalgia, arthritis, hypothyroid, and "anxiety/Depression/BAD."[12] (Tr. 1212). Dr. Schaible's January 2019 opinions are nearly identical to those expressed by Dr. Adhikari a week earlier. (Tr. 1214-1216).

In one of the few distinctions between the two physicians' opinions, all three of Dr. Adhikari's opinions also state that Plaintiff cannot work, whereas Dr. Schaible does not opine on the ultimate issue of disability. (*See*, *e.g*., Tr. 462 (stating Plaintiff "is disabled by her conditions" and cannot "sustain full-time competitive employment."); Tr. 551 (stating she "will have difficulty in working due to mental fog, physical pain" and "has trouble in taking care of personal chores… no doubt that she cannot work."); Tr. 783

---

[11]Dr. Adhikari opined in her August 2017 and January 2019 opinions that Plaintiff would need longer rest breaks of 30-60 minutes after every 30 minutes of work. (Tr. 551, 782).
[12]The reference to "BAD" appears to be an acronym for "bipolar affective disorder." The ALJ listed only depression, anxiety and PTSD as severe impairments. Plaintiff does not challenge that Step 2 finding.

("Patient cannot work due to physical and mental health conditions.")).  Another small distinction concerns the two physicians' opinions concerning the date of onset.  Dr. Adhikari stated in July 2016 that the same limitations "apply back to at least 2014," notwithstanding Plaintiff's November 2015 alleged disability onset.  (Tr. 462). In 2017, she dated the onset of symptoms to March of 2015, while in 2019, she provided no date. (Tr. 551, 784).  In January 2019, Dr. Schaible endorsed the same severity of limitations dating back to "2012."  (Tr. 1216).

Despite strong similarities between all four physical RFC opinions, portions of the opinions arguably suggest improvement over time.  For example, Dr. Adhikari's July 2016 opinion indicates a maximum weight limit of 5 pounds for all purposes and states that Plaintiff could "never or rarely" grasp, turn or twist objects, use her hands/fingers for fine manipulations, or use her arms for reaching.  (Tr. 462).  However, in her August 2017 and January 2019 opinions, Dr. Adhikari states that Plaintiff can "occasionally" perform the same manipulative and reaching activities.  (Tr. 550, 773).  In August 2017, she states that Plaintiff can occasionally lift 10 pounds, occasionally carry up to 20 pounds, and frequently carry up to 5 pounds.  (Tr. 550).  The January 2019 opinions by both Dr. Adhikari and Dr. Schaible reflect even greater lifting abilities (consistent with light work), such as the ability to frequently lift up to 10 pounds and occasionally lift up to 20 pounds. (*See* Tr. 782).

After summarizing Dr. Adhikari's opinions, the ALJ explained why she was declining to give them controlling weight and instead was giving them only limited weight. The ALJ articulated inconsistencies between the opinions and other substantial medical evidence of record, inconsistencies between the opinions and Plaintiff's reported

activities, and Dr. Adhikari's failure to provide specific evidentiary support in her own records for such extreme functional limitations.

> In this case, Dr. Adhikari listed the claimant's various symptoms, but failed to provide specific evidentiary support…. Her assessment also appears generally inconsistent with the medical evidence of record, which documents repeated instances of intact gait and musculoskeletal functioning/strength, as well as the other evidence of record regarding the claimant's various activities (B1F/6, B6F/13, B12F/8, B15F/9, B19F/11, B26F/26, B4E, and testimony *for example*). In addition, a finding of disability is one reserved to the Commissioner.

> …Dr. Adhikari later completed a fibromyalgia questionnaire dated August 4, 2017….[and] made similar findings in a pain assessment dated January 9, 2019 (B22F). Again, although Dr. Adhikari is a treating source, her assessment appears extreme in light of the medical evidence of record, including various instances of intact gait and musculoskeletal functioning as well as the claimant's own reports of improvement with medication (B1F/6, 13, B6F/13, B12F/8, B15F/9, B19F/11, B26F/26, *for example*). As such, limited weight is given.

(Tr. 25).  Turning to Dr. Schaible's virtually identical January 2019 opinions, the ALJ gave her opinions "limited weight" for the same reasons.  (Tr. 26).

In arguing for reversal, Plaintiff begins with the contention that it was error for the ALJ to discount all opinions on grounds that the disability decision is "reserved to the Commissioner."  However, the ALJ did not reject <u>all</u> of Dr. Adhikari's opinions for that reason, but instead clearly articulated why the opinions were not entitled to controlling weight: because they were not well supported and were inconsistent with other substantial evidence.  The rejection of Dr. Adhikari's singular opinion that Plaintiff is disabled from all work was entirely appropriate.  Regulations draw distinctions between the type of medical "opinions" from treating physicians that are entitled to controlling weight, and legal determinations that must be made by an ALJ. "When a treating physician ... submits an opinion on an issue reserved to the Commissioner - such as whether the claimant is 'disabled' or 'unable to work' the opinion is not entitled to any

particular weight." *Turner v. Com'r of Soc. Sec.*, 381 Fed. Appx. 488, 492 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527(d)(1). Likewise, it is the ALJ who remains responsible to determine a claimant's RFC. 20 C.F.R. § 404.1527(d)(2).

Plaintiff next suggests that the ALJ may have erred by finding the treating physicians' opinions to be inconsistent with the opinions of the non-examining consultants – the type of error that required reversal in *Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013). But the ALJ's decision in this case gives no indication of that particular error. The ALJ did not cite to the consultants' opinions in her assessment of the treating physician opinions, but rather, cited to other substantial evidence of record including Dr. Adhikari's own records. Consistent with that analysis, Plaintiff's records from multiple visits over the disability period reflect tiredness primarily as a medication side effect and pain complaints primarily in her back, shoulders, neck and knees, with no reference to many of the allegedly disabling symptoms included on the symptom list in Dr. Adhikari's three opinion letters. *See also Dwigans v. Com'r of Soc.Sec.*, 2018 WL 4216844, at *6 (S.D. Ohio 2018) (affirming where treating physician's opinions were unsupported by her own treatment records or exam findings, and were refuted by other subjective reports in the record); *Dunn v. Com'r of Soc. Sec.*, 2016 WL 4194131, at *7 (S.D. Ohio 2016) (pointing out that treating physician's records "are strikingly devoid of even <u>subjective</u> complaints by Plaintiff that would support the extreme functional limitations endorsed," and that in "stark contrast" to his RFC opinions, the physician's records reflected "benign" findings, and stated that the plaintiff had obtained "excellent result[s]" with medication management of his fibromyalgia.).

Plaintiff alternatively argues that the ALJ erred by failing to give greater weight to her treating physician opinions than to the consulting opinions pursuant to SSR 96-2p,

20

even if the treating physicians were not entitled to controlling weight. However, SSR 96-2p was formally rescinded on March 27, 2017. In any event, the ALJ's opinion expressly reflects consideration of the applicable regulatory factors provided in 20 C.F.R. § 404.1527. (Tr. 26, citing regulation and listing factors to be considered including length of treatment relationship, frequency of treatment, nature and extent of treatment relationship, supportability of the opinion, consistency of the opinion, any relevant specialty of the treating source and other relevant factors).

Last, Plaintiff asserts that the ALJ's analysis "indicates a fundamental misunderstanding of fibromyalgia, the primary cause of [Plaintiff's] physical disability, which is not documented by changed in gait or musculoskeletal findings." (Doc. 10 at 22, PageID 1406). Because Plaintiff relies on chronic fibromyalgia pain, she argues that the ALJ's focus on "normal physical findings" is "irrelevant." (*Id.* at 23, PageID 1407). But SSR 12-2p confirms that objective evidence remains relevant. And a mere diagnosis of fibromyalgia does not mandate a disability finding, as most people who suffer from that condition retain the ability to work. *See Tyrpak v. Astrue*, 858 F. Supp.2d 872 (N.D. Ohio 2012) (affirming ALJ determination that plaintiff who suffered from fibromyalgia, back impairment, major depressive disorder and obesity could still perform light work, holding that ALJ articulated good reasons for rejecting unsupported opinions of primary care physician and treating rheumatologist).

In general, Plaintiff relies heavily upon *Rogers*, but it is worth pointing out that in that case the ALJ did not find fibromyalgia to be a "severe" impairment at Step 2 of the sequential analysis, based upon a mistaken reliance on objective tests and failure to recognize the tender point standard. *See Rogers v. Com'r*, 486 F.3d 234, 243 (6th Cir. 2007) (noting improper hesitancy in identifying FM as severe impairment); *accord*

*Kalmbach v. Com'r of Soc. Sec.*, 409 Fed. Appx. 852, 859 (6th Cir. 2011) (reversing based upon "gaping" hole in ALJ's analysis including a failure to identify fibromyalgia as a severe impairment and overreliance on objective tests). By contrast, the ALJ here had no qualms about identifying Plaintiff's fibromyalgia to be a "severe" impairment at Step 2. More importantly, the ALJ's remaining sequential analysis of Plaintiff's fibromyalgia is substantially supported. Unlike in *Kalmbach* and *Rogers*, the ALJ here relied primarily on the longitudinal clinical examination records and other evidence; she did not mistakenly rely upon objective tests to discredit the diagnosis.

Acknowledging that the ALJ focused on records that suggested stability and improvement over time, Plaintiff complains that the ALJ erred in assuming that her improvement was sufficient to allow her to enter the workforce.[13] Plaintiff describes her improvement as "modest, at best, and short-lived." (Doc. 10 at 24, PageID 1408). The Court agrees that the record reflects some variability in Plaintiff's improvement. However, the fact that Plaintiff's improvement was not completely linear does not mandate a finding of disability, so long as substantial evidence exists that shows that the ALJ's analysis of the record was within the "zone of choice." The ALJ's analysis meets that standard and this Court may not reweigh the evidence. *Mullins v. Sec'y of Health and Human Services*, 680 F.2d 472, 472 (6th Cir. 1982).

As the ALJ explained, many of Dr. Adhikari's abnormal findings related to Plaintiff's knees and many of her pain complaints occurred prior to, and appeared to resolve with, her successful knee replacement in January 2018. (Tr. 22-23, 433, 569-70, 432, 442,

---

[13]As part of this argument, Plaintiff maintains that the ALJ erred by concluding that her treating physicians' opinions conflicted with evidence concerning Plaintiff's activities of daily living. (Doc. 10 at 24, citing Tr. 26). The Court addresses this argument in the context of Plaintiff's second claim of error.

649).  In fact, at the hearing Plaintiff testified that her knee no longer bothers her much, and stated that her back pain is also "low" on her list of problems.  (Tr. 46-47).  In addition, the ALJ appropriately pointed to multiple records from Dr. Adhikari during the relevant period that reflect improvement to fewer than 11 tender points on clinical examination and a "stable" condition that was effectively managed with prescribed medication and aquatic physical therapy.  (Tr. 22-23; *see*, *also*, *generally* Tr. 559, 442, 448-50, 649, 653; Tr. 863 (pain level subjectively reported at "2" in her back)).  The referenced records comprise substantial evidence to support the ALJ's determination that Plaintiff's fibromyalgia symptoms have either improved or remained stable over time.  *Accord Vance v. Com'r of Social Sec.*, 260 Fed. Appx. at 807 (affirming non-disability decision where fibromyalgia symptoms were stable or improved).

## Consulting Physicians Siddiqui and Prosperi

In addition to challenging the failure to give controlling weight to her treating physicians, Plaintiff maintains that the ALJ erred by giving "some weight" to the opinions of two non-examining consultants, Drs. Siddiqui and Prosperi, dated March 13 and June 9, 2017, respectively.  (Tr. 98, 103, 115, 120).  Plaintiff complains that the consultants had access to a limited record that failed to include records up to her DLI date of September 30, 2018.  However, it is not error to give greater weight to consulting opinions than to treating physicians so long as the ALJ acknowledged the limited scope of review of the consulting opinions and gave "some indication" that the ALJ "subjected such opinions to scrutiny."  *Kepke v. Com'r of Soc. Sec.*, 636 Fed. Appx. 625, 632 (6th Cir. 2016).  The ALJ's analysis satisfies that standard.

For example, the ALJ specifically discussed later records that were not available to the consultants including Plaintiff's January 2018 total knee replacement and her

23

complaints of chronic pain. (*See* Tr. 23, discussing complaints of chronic pain and records from late 2017 through October 2018). The ALJ added multiple physical limitations that were not included by Drs. Siddiqui or Prosperi, such as manipulative limitations that partially took into account restrictions endorsed by Plaintiff's treating physicians, including limits on the operation of foot controls ("no more than 20% of the workday bilaterally"), and overhead reaching (no more than 10%). (Tr. 25). The ALJ also added environmental restrictions to avoid "all exposure to extreme cold and extreme heat" and "all use of dangerous machinery and all exposure to unprotected heights." (*Id.*) In addition, the ALJ included a "a sit/stand option at will provided that she is not off task more than 10% of the workday." (*Id.*) In other RFC areas, the ALJ disagreed with the consulting opinions and increased the degree of limitations. (*See id.*, increasing the limitations on stooping, crouching and crawling). Because the ALJ imposed significantly greater restrictions than those endorsed by Drs. Siddiqui and Prosperi and explained the basis for those additional limitations, I find no error. *Accord Clemow*, 2018 WL 1083494, at *6 (rejecting same argument); *see also Viera v. Com'r of Soc. Sec.*, 2019 WL 8750418 at *7 (E.D Mich. Oct. 25, 2019) (holding that ALJ's inclusion of more restrictive limitations in the RFC than those opined by state agency consultants was proof that ALJ considered the entire record).

### Certified Nurse Practitioner and Consulting Psychologists

Similar to arguments concerning the evaluation of the physical opinion evidence, Plaintiff argues that the ALJ failed to properly weigh the mental RFC opinion evidence. The ALJ gave "little weight" to the March 17, 2017 mental RFC opinions of Certified Nurse Practitioner ("CNP") Keisha Jordan, while giving "some weight" to two state agency mental assessments dated February 27, 2017 and July 20, 2017. (Tr. 25-26).

Plaintiff began treating with CNP Keshia Jordan in November 2016, a little more than a year after her alleged onset of disability. (Tr. 463). On March 17, 2017, CNP Jordan completed a "check-box" style mental RFC form in which she diagnosed PTSD and major depressive disorder ("MDD") with psychotic features, and endorsed many "marked" limitations across all functional areas. (Tr. 504, 509, *see generally* Tr. 501-05, 506-10 (duplicate)). CNP Jordan opined that Plaintiff would be absent from work more than three times per month (Tr. 505, 510). After reviewing the record, the ALJ found the CNP's opinions to be unsupported and inconsistent with other substantial evidence:

> Little weight is given to Jordan Keshia, CNP,[14] who provided a mental impairment questionnaire dated March 17, 2017, in which she diagnosed PTSD and MDD-recurrent with psychotic features and opined the claimant had numerous moderate to marked limitation in functioning, including marked limitation in understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without supervision; performing at a consistent pace; interacting appropriately with the public; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to workplace changes; and making plans independently (B7F, B8F). She opined the claimant would be absent more than 3 times per month. Although Ms. Keshia is a treating source, she is not considered an "acceptable" medical source. Her assessment of moderate to marked and marked limitation is merely a "check-the-box" type form and fails to provide specific evidentiary support for such extreme limitations. In addition, her assessment is inconsistent with the record, which often documents intact mental status examination findings (B18F/6, B19F/3, *for example*). The claimant's own reports of functioning also suggest greater ability (B4E, B19F/2, testimony).

(Tr. 27).

Plaintiff concedes that a CNP is not an acceptable medical source under the relevant regulations, but argues that the ALJ erred in failing to give the CNP's opinion "appropriate consideration." Under 20 C.F.R. § 404.1513(d), an opinion from a non-

---

[14]The ALJ mistakenly transposed the provider's first and last names. The record reflects that her name is Keshia Jordan. (*See* Tr. 463).

acceptable medical source must still be considered in determining "the severity of the claimant's] impairment(s) and how it affects [the claimant's] ability to do work."[15] Contrary to Plaintiff's argument, the Court concludes that the ALJ's review of CNP Jordan's opinions comported with that requirement.

Plaintiff accuses the ALJ of ignoring mental status exams that supported a finding of more extreme mental limitations. However, the ALJ specifically discussed two mental status exams, in February and July 2017. (Tr. 24, citing Tr. 463, 820). While Plaintiff cites to other mental status exams, (*see e.g.*, Tr. 464, 632, 635, 694, and 763), she fails to identify or discuss anything on those pages that would undermine the weight given to the CNP's opinions or the ALJ's conclusion that Plaintiff's mental symptoms, while severe, were not disabling. Having examined all of the cited pages, the Court finds little variation in mental status other than the rare finding of a "labile" or "anxious" mood (Tr. 633, 694), with nothing that would suggest a symptom severity at a disabling level. Considering the record as a whole, the ALJ acknowledged that Plaintiff has severe impairments, struggles with irritability, and sometimes forgets to take her medication. (Tr. 19, 24, 27). But the fact that Plaintiff experiences some symptoms does not undercut the ALJ's conclusions that her symptoms were not disabling. As the ALJ explained, Plaintiff herself reported that her depression was stable and improving with medication. (Tr. 24, 432, 448, 632, 641, 694, 721). At times, Plaintiff denied suffering from anxiety or depression at all and reported she was fine. (Tr. 24, 721, 820). On the whole, substantial evidence exists to support the ALJ's analysis of CNP Jordan's opinions, which opinions otherwise were very poorly supported by the record.

---

[15]Plaintiff cites to related SSR 06-03p, but that ruling has been rescinded.

In addition to criticizing the ALJ's failure to give greater weight to CNP Jordan's check-box form, Plaintiff is critical of the ALJ's assessment of the consultants' mental RFC opinions, to whom the ALJ afforded only "[s]ome weight."

> Some weight is given to the State agency mental assessments … which found mild to moderate mental limitation (1A, 3A). Specifically, it was opined the claimant retains the capacity to learn and perform 1-3 step tasks in a setting without demands for fast pace; interaction with others need to be on a superficial level with no conflict resolution or persuading others; she can adapt to settings without frequent changes; and depression and anxiety would affect coping responses in the workplace. The undersigned concurs the claimant has no more than moderate limitations, but has found somewhat different functional limitations in order to better quantify the claimant's limitations. For example, given the claimant's allegations concerning concentration and persistence (B4E, testimony), the undersigned has provided for limitation to simple, routine tasks and goal-oriented work with no constant production rate pace work and no strict hourly quotas.

(Tr. 25).

Plaintiff does not identify any specific error other than again complaining that the consulting opinions were based upon an incomplete record.  It is worth pointing out that CNP Jordan's opinions were issued at the same time, encompassing the same limited record.   Regardless, it is not error to give weight to consulting opinions rendered on an incomplete record, so long as the ALJ has considered the complete record.  Here, the ALJ clearly considered the record as a whole in formulating additional mental RFC limitations that were not endorsed by either of the agency consultants.

### D.  Plaintiff's Second Claim: The Evaluation of Subjective Complaints

Plaintiff's second claim is that the ALJ failed to properly evaluate her subjective complaints.  In nearly all cases, an ALJ must evaluate a claimant's subjectively reported symptoms.  While the more recently enacted SSR 16-3p describes the review of such symptoms as a "consistency" analysis, as opposed to earlier language that used the term

"credibility," the essence of the analysis has not changed.[16] In fibromyalgia cases, the assessment of subjective symptoms is often of critical importance. *See* SSR 12-02p; *see also Swain v. Com'r of Soc. Sec.,* 297 F.Supp.2d 986, 993 (N.D. Ohio 2003) (reversing where ALJ relied solely on objective tests and failed to acknowledge longitudinal clinical data including the treating physician's "finding that Swain exhibited ….18 of the 18 designated tender points.").

Plaintiff generally testified that she was disabled from working due to chronic FM pain that is most severe during FM flares. She testified that her flare-ups occur irregularly, with no flares in some months and up to two in other months and with "a couple months in-between" episodes at times. (Tr. 50). When FM flares occur they can last up to "a couple of days" at a time. (*Id*.) Describing the intensity of her symptoms, she explained that "if I had to go somewhere, I would get up and go," but would avoid driving if she could. (Tr. 51).

The ALJ fully discussed Plaintiff's subjective complaints and partially accounted for her testimony by including specific postural and manipulative restrictions in her RFC assessment. (Tr. 21-22, 25). However, the ALJ disagreed with Plaintiff's subjective report that her pain and other symptoms precluded all work, concluding instead that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her]

---

[16]SSR 16-3p is the operative rule for claims filed after March 2016. In SSR 16-3p, the Agency removed the word "credibility" from an earlier rule (SSR 96-7p), and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added). SSR 16-3p states that "our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." *See id.* at *11. The elimination of the term "credibility" in SSR 16-3p can be semantically awkward since the prior case law uses the catchphrase "credibility determination." Nevertheless, the essence of the regulatory framework remains unchanged. Therefore, courts agree that the prior case law remains fully applicable to the renamed "consistency determination" under SSR 16-3p, with few exceptions. *See Duty v. Com'r of Soc. Sec.*, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018) ("existing case law controls to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification.").

symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 22).

In evaluating subjective symptoms, an ALJ must consider relevant factors under 20 C.F.R. § 404.1529(c). Citing case law that warns against equating the ability to engage in daily activities with the ability to sustain full-time work, Plaintiff maintains that the ALJ overly focused on her daily activities in this case. *See generally*, *Rogers*, 486 F.3d at 248-49. Plaintiff further suggests that the ALJ's analysis violated 20 C.F.R. Pat. 404, Appx 1 of Subpart P, § 12.00(D)(3)(a) ("[T]he fact that you have done, or currently do, some routine activities without help or support does not necessarily mean that you do not have a mental disorder or that you are not disabled.").

The Court finds no reversible error. While it is true that a plaintiff's ability to engage in routine activities "does not necessarily mean" that she is not disabled, all relevant regulations make clear that an ALJ is permitted to a claimant's activities of daily living as part of the entire record. An ALJ not only may, but should consider activities of daily living including household and social activities when evaluating complaints of disabling pain. See 20 C.F.R. § 404.1520(c)(3)(i); *see also* SSR 16-3p (listing daily activities as the first of seven factors to be considered); *O'Brien v. Com'r of Soc. Sec*. 2020 WL 4559505 at *7 (6th Cir. Aug. 7, 2020). An ALJ also may consider daily activities when assessing whether a medical opinion is consistent with substantial evidence in the record.[17] *See, e.g., Swartz v. Com'r of Soc. Sec*., 2014 WL 868127 at *6 (S.D. Ohio March 5, 2014) (discussion of "activities of daily living gave context to ALJ's articulated reasons for discounting Dr. Khan's opinions") (additional citation omitted).

---

[17]The ALJ also cited Plaintiff's activity level and subjectively reported symptoms as a partial basis for rejecting the opinions of some treating providers.

Here, the ALJ discussed Plaintiff's reports that she drives regularly, shops occasionally, visits her children and grandchildren,[18] prepares simple meals, denies any significant issues with maintaining personal care, manages her finances, and performs light household chores including vacuuming and laundry. (Tr. 22-23, 25, 351-353). The ALJ noted that Plaintiff's reports of her daily activities were "somewhat inconsistent with her allegations" of disabling symptoms. (*See* Tr. 25, citing Tr. 713 ("Pt stated she cleans after her daughter and takes care of her dog" and reported her pain level as a "5"). However, Plaintiff's daily activity level was but one of several factors that the ALJ considered in evaluating Plaintiff's subjectively reported symptoms.

The ALJ also pointed to objective medical evidence in which physical examinations "remained largely unremarkable" and Plaintiff's denials of joint pain, swelling or stiffness apart from her knee osteoarthritis, which was improved following her TKR. (Tr. 22-23). The ALJ further cited longitudinal records showing that Plaintiff's fibromyalgia was "stable on medications" and that Plaintiff reported "feeling much better" physically with medications and aqua therapy. (*Id*.) The ALJ cited her "relatively conservative treatment" for FM, as well as her non-compliance with prescribed treatment at times, including the discontinuation of PT, a physical exercise program, and using a prescribed CPAP machine. (Tr. 24). *Accord Warren v. Com'r of Soc. Sec*., 810 Fed. Appx. 445, 448 (6th Cir. 2020) (finding that fibromyalgia that is manageable with treatment does not support disability).

---

[18]For example, at the hearing, the ALJ noticed and inquired about Plaintiff's tan. She explained that she had stayed over at her son's house for the weekend and was "outside all that time" because they were celebrating her grandkids' birthdays with a party. (Tr. 60)

Plaintiff cites case law from the Fourth, Eighth and Ninth Circuits that support her assertion that FM "cannot be treated through aggressive means," (Doc. 10 at 33), but Sixth Circuit case law as well as SSR 16-3p support the ALJ's reference to this factor. *See Branon v. Com'r of Soc. Sec*., 539 Fed. Appx. 675, 678 (6th Cir. 2013) (regarding fibromyalgia, "conservative treatment approach suggests the absence of a disabling condition"); SSR 16-3p (fifth and sixth factors).  In addition, Plaintiff does not cite to any records that suggest that she sought either additional or alternative treatment, or that counters the ALJ's conclusion that her medications were effective.  *See generally, Warren*, 810 Fed. Appx. at 448 (affirming denial of disability claim where medications helped to control FM symptoms).

The ALJ also did not err in pointing out that despite showing improvement with PT, Plaintiff unilaterally stopped attending PT.  (Tr. 22, 24).  Plaintiff asserts that her non-compliance was brief and should be excused by her mental impairments, but the record does not support that argument. Plaintiff testified only that she struggled to keep track of her many appointments, not that she struggled to attend them. Additionally, she reported that she was better at keeping track of them by July 2018.  (Tr. 755, 773).  In discounting Plaintiff's subjectively reported mental complaints, the ALJ similarly relied on records that suggested that Plaintiff's symptoms were stable with medication.  Plaintiff reported on more than one occasion that her medications "have been helping" even though she sometimes forgot to take them.  (Tr. 25).  And as with treatment for her physical symptoms, the ALJ referenced Plaintiff's "mostly conservative care," including a lack of psychiatric hospitalization.  (*Id*.)

Based upon the totality of the record presented, the ALJ's analysis of Plaintiff's subjective complaints - including both her physical and mental complaints - is

substantially supported.  "Discretion is vested in the ALJ to weigh all the evidence," and the ALJ here did not abuse that discretion.  *Collins v. Com'r of Soc. Sec.*, 347 Fed. Appx. 663, 668 (6th Cir. 2009) (internal quotation marks and citation omitted).  While Plaintiff asserts that the evidence should have been weighed differently, it was the ALJ's duty to resolve conflicting evidence.

### III.  Conclusion and Recommendation

The record presented is one in which substantial evidence exists to support the ALJ's decision, even if this Court might have viewed the same evidence in a different light.  *See Felisky v. Bowen*, 35 F.3d at 1035 (requiring trial courts to affirm if the Commissioner's decision is within the "zone of choice.").  For the reasons explained herein, IT IS ORDERED THAT the Defendant's non-disability decision be AFFIRMED and that this case be CLOSED.

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge